436 Mass. 811 (2002)                     811

Zoning Board of Appeals of Wellesley *v.* Ardemore Apartments Limited Partnership.

Zoning Board of Appeals of Wellesley & another[1] *vs.*
Ardemore Apartments Limited Partnership[2] & another.[3]

Norfolk. January 7, 2002. - May 15, 2002.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Housing. Zoning,* Housing appeals committee, Low and moderate income
housing, Comprehensive permit.

Overview of relevant provisions of the comprehensive zoning law, G. L.
c. 40B, §§ 20-23. [814-816]
Discussion of the intent of the Legislature in enacting the comprehensive
permit statute, G. L. c. 40B, §§ 20-23. [819-825]
This court concluded that the owner of a thirty-six unit apartment building in
an area of a town zoned as a single-family district had a continuing obliga-
tion to make some of the apartments available at below market rents,
where permission to build the complex was secured under the comprehen-
sive permit statute, G. L. c. 40B, §§ 20-23 (Act); further, where the
comprehensive permit itself did not specify for how long housing units
must remain below market, the Act required the owner to maintain the
units as affordable for as long as the housing was not in compliance with
local zoning requirements, regardless of the terms of any attendant
construction subsidy agreements. [813-814, 825-828]

Civil action commenced in the Superior Court Department on
June 17, 1999.

The case was heard by *Elizabeth B. Donovan,* J., on motions
for summary judgment.

The Supreme Judicial Court granted an application for direct
appellate review.

*Brian C. Levey* (*Maura A. Gallagher* with him) for Ardemore
Apartments Limited Partnership.

*Albert S. Robinson,* Town Counsel, for the plaintiffs.

*Thomas A. Barnico,* Assistant Attorney General, for Housing
Appeals Committee.

[1]The town of Wellesley acting by and through its board of selectmen.
[2]By American Landmark Real Estate Corporation, its general partner.
[3]Housing Appeals Committee.

The following submitted briefs for amici curiae:

*Robert D. Smith,* Town Attorney, & *Thomas J. Urbelis* for Massachusetts City Solicitors and Town Counsel Association.

*J. Owen Todd, Christopher Weld, Jr.,* & *Edward Foye* for Massachusetts Housing Finance Agency.

*David A. Brown* & *Kurt A. James* for Massachusetts Municipal Association & others.

*Michael E. Malamut* for New England Legal Foundation.

*Margaret Turner, Ann Jochnick, Allan G. Rogers, Marc Potvin,* & *Stephen Matthews* for Massachusetts Alliance of HUD Tenants & others.

MARSHALL, C.J. We must decide in this case whether the owner of a thirty-six unit apartment building in an area of the town of Wellesley zoned as a single-family district has a continuing obligation to make some of the apartments available at below market rents, where permission to build the complex was secured under the comprehensive permit statute, G. L. c. 40B, §§ 20-23 (Act). The permit was issued in July, 1982, to Cedar Street Associates (owner)[4] by the Zoning Board of Appeals of the town of Wellesley (the town and the Zoning Board of Appeals are collectively referred to as Wellesley). A comprehensive permit is available only when proposed housing is "subsidized by the federal or state government under any program to assist the construction of low or moderate income housing." G. L. c. 40B, § 20. In this case, construction financing for the project was provided by a loan from the Massachusetts Housing Finance Agency (MHFA) and a second loan from MHFA and the Executive Office of Communities and Development (EOCD) under the State housing assistance for rental production program (SHARP loan).[5]

The subsidized construction financing agreements provided

----

[4]Cedar Street Associates is a limited dividend organization. See *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.,* 385 Mass. 651, 652 (1982). It is the predecessor-in-interest to defendant Ardemore Apartments Limited Partnership (Ardemore). Unless otherwise noted, we shall refer to Ardemore and Cedar Street Associates, individually and collectively, as "the owner."

[5]The Massachusetts Housing Finance Agency (MHFA) was created by the Legislature in 1966 to address the "acute shortage of decent, safe and sanitary housing available at low rentals which persons and families of low income

that the owner was to rent a specified percentage of the units to low or moderate income persons for at least fifteen years, until July, 2000. In contrast, the comprehensive permit issued by Wellesley does not specify for how long the project was to remain affordable to low or moderate income persons; it is silent on the point. The Act similarly contains no express provision addressing the continuing effect of affordability restrictions.

The owner claims that the Act contemplates that units are to be maintained as affordable for a limited time only, that the "expiring use restriction" provisions of the construction financing agreements determine the date of expiration of the restrictions,[6] in this case July, 2000, and that the low or moderate income units may now all be converted to market rate rentals. Wellesley and the Housing Appeals Committee (HAC)[7] contend that the units must be preserved as affordable for so long as the apartment building is not in compliance with Wellesley's zoning requirements.

We conclude that, where a comprehensive permit itself does not specify for how long housing units must remain below market, the Act requires an owner to maintain the units as affordable for as long as the housing is not in compliance with local zoning requirements, regardless of the terms of any attendant construction subsidy agreements. This is consistent with

. . . can afford." St. 1966, c. 708, § 2. MHFA makes mortgage loans to owners of projects renting at least twenty-five per cent of the units to persons or families of low income.

[6]"Expiring use restriction" is a term used to describe the expiration of restrictions placed on the use of property. See, e.g., Note, Expiring Use Restrictions: Their Impact and Enforceability, 24 New Eng. L. Rev. 155 (1989) (addressing expiring uses in the context of subsidized funding programs). The Housing Appeals Committee (HAC) has described "expiring use" in this context as "the phenomenon whereby in the middle of the 1980's and continuing thereafter, as lock-in periods for affordable housing units in subsidized housing developments began to expire, the affordable units reverted to 'market rate' rentals, or were sold as condominiums."

[7]HAC is a five-person board organized under G. L. c. 23B, § 5A, and is authorized to hear appeals from the denial of an application for a comprehensive permit. G. L. c. 40B, §§ 20-23. HAC characterizes itself as "in effect a nominal defendant," noting that the complaint does not state a claim against HAC, nor does the complaint allege any error by HAC in "any decision, order, ruling, or opinion." A judge in the Superior Court denied a motion by the owner to dismiss HAC as a defendant. The propriety of that decision has not been pursued on appeal.

the Legislature's intent when it enacted the comprehensive permit statute in 1969 to create a long-term solution to the shortage of affordable housing throughout the Commonwealth. By receiving permission to build a multi-unit apartment building in violation of local zoning laws the owner received — and continues to receive — a great benefit. We see nothing in the Act to suggest that the Legislature intended to override local zoning autonomy only to create a fleeting increase in affordable housing stock, leaving cities and towns vulnerable to successive zoning overrides, and the issuance of a never-ending series of comprehensive permits.[8]

1. *The statutory scheme.* Although other Massachusetts appellate decisions have described the provisions of the comprehensive zoning law, see, e.g., *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339 (1973) (upholding constitutionality of statute); *Zoning Bd. of Appeals of Greenfield* v. *Housing Appeals Comm.*, 15 Mass. App. Ct. 553, 555-557 (1983) (discussing statutory and regulatory scheme), a brief overview of the relevant provisions is helpful.

General Laws c. 40B, §§ 20-23, sometimes referred to as the anti-snob zoning act, *id.* at 555, was enacted "to provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing." *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, supra at 354. The Act defines low or moderate income housing as "any housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any nonprofit or limited dividend organization." G. L. c. 40B, § 20.

Among other things, the Act permits multi-family housing

[8]We acknowledge the amicus briefs of (1) the Massachusetts Housing Finance Agency; (2) the Massachusetts City Solicitors and Town Counsel Association; (3) the New England Legal Foundation; (4) the Massachusetts Alliance of HUD Tenants, Reverend Alphonso and Willa Wells, Sabrina and Kendall Worley, Jennifer and Craig Fleming, and Cheryl, Jacqueline, Janelle, Daniel and Ruffell Killion; and (5) the Massachusetts Municipal Association, Massachusetts Association of Planning Directors, Massachusetts Federation of Planning and Appeals Boards, Citizens Housing and Planning Association, Metropolitan Area Planning Council, and Massachusetts Chapter of the American Planning Association.

structures in zones designated for single-family housing where there is a local shortage of affordable housing as defined in the statute. G. L. c. 40B, §§ 20, 23. See generally *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra.* A developer who wishes to build such housing may file with a local zoning board an application for a comprehensive permit rather than seeking separate approval from each local board having jurisdiction over the project.[9] See G. L. c. 40B, § 21. See also *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 656 (1982). If a local zoning board denies an application for a comprehensive permit, or approves an application but imposes conditions that make the project "uneconomic," G. L. c. 40B, § 20, the applicant may appeal to HAC, G. L. c. 40B, § 22, which conducts a de novo review to determine whether a local zoning board's decision is "reasonable and consistent with local needs." G. L. c. 40B, § 23. See *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 371. See also note 7, *supra.* HAC must decide whether the need for low or moderate income housing in a town outweighs the valid planning objections to the proposal, such as health, site design, and space. *Id.* at 367. If HAC finds that the decision of the local board is not justified it may direct the local board to issue a comprehensive permit. G. L. c. 40B, § 23. But if a town has already met its share of low and moderate income housing,[10] the local zoning board may deny an application for a comprehensive permit,

[9]General Laws c. 40B, § 21, provides that the local zoning board has "the same power to issue permits or approvals as any local board or official who would otherwise act with respect to such application, including but not limited to the power to attach to said permit or approval conditions and requirements with respect to height, site plan, size or shape, or building materials as are consistent with the terms of this section." See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 355 (1973).

[10]A town has fulfilled its minimum housing obligation "where (1) low or moderate income housing exists which is in excess of ten per cent of the housing units reported in the latest federal decennial census of the city or town or on sites comprising one and one half per cent or more of the total land area zoned for residential, commercial or industrial use or (2) the application before the board would result in the commencement of construction of such housing on sites comprising more than three tenths of one per cent of such land area or ten acres, whichever is larger, in any one calendar year." G. L. c. 40B, § 20.

and HAC has no authority to order a local board to issue one. See G. L. c. 40B, §§ 20, 23; *Zoning Bd. of Appeals of Greenfield* v. *Housing Appeals Comm., supra* at 556.

2. *Prior proceedings.* We previously have had occasion to describe earlier challenges to the development of the project at issue in this case. See *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm., supra* at 652. Accordingly, we summarize only briefly the early stages of development.

In 1981, Wellesley was ordered by HAC to issue a comprehensive permit to the owner for construction of the thirty-six unit apartment project at issue here. At the time, Wellesley had not met the statutory minimum requirements for affordable housing.[11] The construction financing provided by MHFA and EOCD was secured by granting MHFA a first mortgage on the project, and the project was granted a certificate of occupancy in 1986.

Ten years later, in June, 1996, Ardemore Apartments Limited Partnership (Ardemore) purchased the project from Cedar Street Associates. See note 4, *supra.* In connection with the sale, Cedar Street Associates, Ardemore, and MHFA entered into certain agreements whereby Ardemore assumed all of the obligations under the financing and related agreements. In addition, Ardemore and MHFA executed a new regulatory agreement that, together with the obligations Ardemore had assumed from Cedar Street Associates, governed Ardemore's operation and management of the project.

In 1997, MHFA seized the property as mortgagee-in-possession, claiming a default on the owner's obligations to it. In April, 1999, the project was subject to a notice of foreclosure by MHFA. Wellesley promptly requested that MHFA condition any ensuing mortgage foreclosure sale on a requirement that twenty-five per cent of the project continue to be maintained as

---

[11]As we noted in *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.,* 385 Mass. 651, 652 (1982), at a hearing before HAC, the planning board chairman testified that the town needed 800 affordable housing units to meet its minimum statutory affordable housing obligation, but had only approximately 397 such units. *Id.* at 658 n.5.

affordable housing "for as long as the building stands."[12] MHFA refused.[13]

In May, 1999, MHFA scheduled a foreclosure auction for June 17, 1999. Wellesley filed a complaint in the Superior Court seeking declaratory and injunctive relief against the owner, MHFA, and HAC. It also sought an order restraining the sale of the project.[14] That same day, the owner filed for protection under c. 11 of the Bankruptcy Code, the effect of which was to stay the Superior Court action, as well as the foreclosure sale. See 11 U.S.C. § 362(a)(1) (2000). On December 2, 1999, at the request of Wellesley, the automatic stay imposed by the Bankruptcy Code was lifted, and the parties filed cross motions for summary judgment.

On March 1, 2000, a plan of reorganization submitted by the owner was confirmed in the Bankruptcy Court. The plan provided for the repayment of the loans by no later than March 31, 2000. The plan also provided that on payment of the indebtedness, all of the agreements between the owner and MHFA "will no longer govern, control or otherwise encumber" the owner's use, occupancy, or sale of the project, and "[s]uch agreements will be null and void in all respects and will no longer be enforceable" against the owner. While the plan of reorganization released the owner from the applicable agreements with MHFA, the owner nevertheless agreed to maintain the nine units as affordable until July 8, 2000, the date provided under the original financing agreements. On March 22, 2000, the Bankruptcy Court entered an order clarifying the amount to

---

[12]Town counsel advised the MHFA that "the affordable units should remain in place for as long as the building stands, since it was the commitment to have affordable units there that enabled the structure to override single family zoning in the first place."

[13]The MHFA responded that, in "the absence of clear binding restrictions on the property's use, [the MHFA] cannot add use restrictions that will alter that [fair market] value." The MHFA also informed town counsel that, although Wellesley's position was "logical," it could not agree to Wellesley's request because "there is a lack of legal precedent for [the MHFA] to incorporate this restriction in its foreclosure documents."

[14]The complaint subsequently was amended to eliminate the request for injunctive relief and was dismissed against the MHFA. Mass. R. Civ. P. 21, 365 Mass. 767 (1974).

be paid to MHFA, and one week later the owner discharged the MHFA mortgage.

Wellesley pursued this action in the Superior Court. In September, 2000, a judge in the Superior Court entered summary judgment for Wellesley and denied the owner's cross motion for summary judgment. She concluded that the comprehensive zoning statute's remedial purposes of providing "relief from exclusionary zoning practices" and addressing "the need for low and moderate income housing," would not be furthered by permitting affordable housing restrictions to expire on the satisfaction of construction financing obligations, in this case payment in full of the MHFA and SHARP loans, and the discharge of MHFA's mortgage.[15] The judge denied the owner's motion for reconsideration or to alter or amend the judgment, and this appeal followed. We granted the application of the zoning board of appeal for direct appellate review.

3. *The undisputed facts.* The parties agree that there are no disputed material facts, and the case is solely one of statutory interpretation.[16] Accordingly, we summarize briefly the terms of the comprehensive permit and the MHFA agreements necessary to our decision in this case.

HAC's 1981 order directing Wellesley to issue a comprehensive permit to the owner, see *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.,* 385 Mass. 651, 652 (1982), placed five conditions on the comprehensive permit, none of which is relevant here. The HAC decision made no mention of

---

[15]The judge also concluded that, while the owner's contractual commitments under the MHFA loans to maintain a certain percentage of units as affordable for a specified time had been satisfied, the SHARP guidelines and contract required that nine units be maintained as affordable even after the construction financing loans were paid and the SHARP subsidies ended. The owner takes issue with the judge's ruling as to the expiration terms of the SHARP guidelines and contracts. We are also cognizant of the MHFA's concern that this aspect of the judge's order, if left undisturbed, may create uncertainty in the interpretation of MHFA construction financing documents on other projects. Because we affirm the judgment of the Superior Court on different grounds, we need not reach this issue.

[16]The owner has moved to strike certain affidavits submitted as an addendum to an amicus brief filed in this matter, in part on the ground that the facts presented in the affidavits were not considered by the Superior Court judge in rendering her decision. We have not relied on the affidavits in reaching our conclusion.

any expiration of the affordability restrictions; it simply did not address the issue. In July, 1982, Wellesley issued the required comprehensive permit in language virtually identical to the HAC order: it restated the five conditions contained in the HAC decision and, like the HAC decision, did not specify any period during which the project was to remain as affordable housing.

In contrast, the financing agreements between the owner and MHFA are quite specific concerning the expiration of affordability. The MHFA restriction provides in pertinent part that the "term of the Occupancy Restrictions" as described in the agreement "shall end . . . fifteen years from the date [of the agreement]," i.e., July 8, 2000. The MHFA restriction further provides that, during that fifteen-year period, "at least 20% of the units in the Project shall be occupied by individuals or families of low or moderate income." The fifteen-year period is commonly known as the "lock-in" period, and the date on which the "lock-in" period ends, here July 8, 2000, is commonly referred to as the "cliff date."

Similarly, the SHARP agreement required annual disbursements of SHARP loan proceeds to be made "for a period not to exceed fifteen years," and provided further that the annual disbursements would be made in amounts that are "appropriate and are the minimum necessary . . . to ensure that twenty-five percent of the Project units will be occupied, for at least fifteen years, by persons and families who are at the time of initial occupancy of low income." Other provisions of the SHARP agreement required that, for "at least fifteen years after the first disbursement of SHARP loan proceeds, twenty-five percent of the project units shall be occupied by persons and families who are, at the time of initial occupancy, of low income."

As a condition of obtaining construction financing from MHFA, the owner agreed to rent twenty per cent of the units to low or moderate income persons or families under a land use restriction agreement, and twenty-five per cent of the units to persons or families of low income under the SHARP agreement, at least until July 8, 2000. But see note 15, *supra*. Wellesley was not a party to the construction financing agreements and had no ability to control or influence their terms.

4. *Discussion.* The issue of the continuing effect of afford-

ability restrictions as applied to comprehensive permit projects is one of first impression. The owner argues that nothing in the Act requires that housing built pursuant to a comprehensive permit be maintained as affordable in perpetuity or for so long as the project remains noncompliant with the relevant local zoning requirements. It points out that the Act itself defines low and moderate income housing by referring to State and Federal construction subsidy programs, and that those programs uniformly permit termination of affordable units on satisfaction of project financing after the "cliff" date. Once the subsidized financing loans have been repaid, it continues, any commitment that the owner undertook to maintain a percentage of the development for low and moderate income persons is no longer applicable.[17]

We consider first the Legislature's intent, with a view to effectuating the purpose of the Act's framers. *Baccanti* v. *Morton,* 434 Mass. 787, 794 (2001). It is abundantly clear that in enacting G. L. c. 40B, §§ 20-23, the Legislature sought a solution to the "acute shortage of decent, safe, low and moderate cost housing throughout the commonwealth," *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 351 (1973); Report of the Committee on Urban Affairs, quoting 1969 House Doc. No. 5429, at 2. The crisis in affordable housing in the Commonwealth mirrored similar concerns nationwide.[18] See generally Symposium, Affordable Housing in Suburbia: The Importance But Limited Power and Effectiveness of the State Override Tool, 22 W. New Eng. L. Rev. 323, 326-334 (2001). In response, the Federal government and many States enacted a variety of legislative programs designed to address the housing needs of persons of low income. Roisman,

[17]Ardemore also claimed that it purchased the project on the "understanding" that the affordable housing requirements of the MHFA loans and the SHARP loan would cease on July 8, 2000, and that the project could thereafter be rented, sold, or converted to condominium units at market rates on satisfaction of the MHFA loans and SHARP contract. Whatever the validity of Ardemore's "understanding," it does not inform our analysis of the statute.

[18]See, e.g., Alaska Stat. §§ 18.56.090 et seq. (Lexis 2000); Ariz. Rev. Stat. Ann. §§ 41-3953 et seq. (Supp. 2001); Conn. Gen. Stat. §§ 8-242 et seq. (West 2001); Fla. Stat. §§ 420.526 et seq. (1998); Minn. Stat. Ann. §§ 462A.05 et seq. (West 2001); N.Y. Priv. Hous. Fin. Law § 44c (McKinney 1991); N.C. Gen. Stat. § 122A-5.2 (Lexis 1999).

Opening the Suburbs to Racial Integration: Lessons for the 21st Century, 23 W. New Eng. L. Rev. 65, 66-70 (2001); Symposium, *supra* at 327 n.12. State and Federal subsidies for construction mortgage loans were one form of legislative intervention. See St. 1966, c. 708, § 2 (low interest mortgage loans made by MHFA to owners of projects renting twenty-five per cent of units to low income persons at affordable levels). See also Christians, Breaking The Subsidy Cycle: A Proposal For Affordable Housing, 32 Colum. J.L. & Soc. Probs. 131, 132-134 (1999) (citing Federal examples).[19] Massachusetts, however, was the first in the nation and one of a small number of States to enact legislation permitting overrides of local zoning decisions to promote affordable housing in particular areas.[20] Courts

---

[19]Examples include "Community Development Block Grants, 42 U.S.C. §§ 5301-5303, to help communities with economic development," and "mortgage and loan insurance through the Federal Housing Administration, 12 U.S.C. § 1707-1724." Christians, Breaking the Subsidy Cycle: A Proposal for Affordable Housing, 32 Colum. J.L. & Soc. Probs. 131, 132 n.10 (1999). See, e.g., 42 U.S.C. § 1485 (rural rental housing program) (1994 & Supp. V 1999).

[20]To our knowledge only three other States have enacted comprehensive permit laws. See Symposium, Affordable Housing in Suburbia: The Importance But Limited Power and Effectiveness of the State Override Tool, 22 W. New Eng. L. Rev. 323, 327-328 (2001). The statutes of two of those States, Connecticut and Rhode Island, were modeled on the Massachusetts Act. Compare Conn. Gen. Stat. § 8-30g (West 2001), and R.I. Gen. Laws §§ 45-53-1 to 45-53-8 (1999 & Supp. 2001), with G. L. c. 40B, §§ 20-23. See Krefetz, The Impact and Evolution of the Massachusetts Comprehensive Permit and Zoning Appeals Act: Thirty Years of Experience with a State Legislative Effort to Overcome Exclusionary Zoning, 22 W. New Eng. L. Rev. 381, 384 (2001). New Jersey's statute, N.J. Stat. Ann. §§ 52:27D-301 to 52:27D-329 (West 2001), was the legislative response to *South Burlington County N.A.A.C.P.* v. *Mount Laurel,* 67 N.J. 151, 178-181, appeal dismissed and cert. denied, 423 U.S. 808 (1975), in which the Supreme Court of New Jersey concluded that each town had a State constitutional obligation to meet a fair share of the regional housing need. Roisman, Opening the Suburbs to Racial Integration: Lessons for the 21st Century, 23 W. New Eng. L. Rev. 65, 68 & n.21 (2001). Although California has a similar statute, Cal. Gov't Code §§ 65580-65589.8 (West 1997), "there are no reported cases involving any override, no state regulations establishing any override procedures, and no discussion of the override's use in the extensive literature on California affordable housing." Symposium, *supra* at 327 & n.12.

Several other jurisdictions, such as California, Oregon, Florida, and Montgomery County, Maryland, "have encouraged suburban affordable housing through legislation, they have used techniques other than state override

in those jurisdictions, as here, have not considered whether the expiring use restrictions as applied to comprehensive permit projects are short term. Similarly, there is no Federal counterpart legislation, and the Federal law on which the owner relies sheds no light on our inquiry. See, e.g., *Cienega Gardens* v. *United States*, 194 F.3d 1231, 1235 (Fed. Cir. 1998), cert. denied sub nom. *Sherman Parks Apartments* v. *United States*, 528 U.S. 820 (1999) (describing congressional efforts to halt anticipated loss of affordable units to prepayment, and noting that use restrictions terminated on satisfaction of financing obligation insured by United States Department of Housing and Urban Development).

The availability of a comprehensive permit to override local opposition to housing for low income persons was a particularized solution crafted by the Massachusetts Legislature to address its concern "with the cities' and towns' possible use of their zoning powers to *exclude* low and moderate income groups" (emphasis added). *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, *supra* at 347.[21] Thus the Legislature was concerned not only with facilitating the construction of affordable housing, *Zoning Bd. of Appeals of Greenfield* v. *Housing Appeals Comm.*, 15 Mass. App. Ct. 553, 555 (1983), but with ensuring that every city and town in the Commonwealth has available a certain minimum amount of affordable housing stock. The Act reflects the Legislature's careful balance between leaving to local authorities their well-recognized autonomy generally to establish local zoning requirements,[22] see *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, *supra* at 367,

---

statutes. . . . Dating back to the 1970s, inclusionary zoning ordinances were created both as part of air pollution control programs encouraged by the federal Environmental Protection Agency and in response to skyrocketing housing prices." *Id.*

[21]While some see the enactment of the comprehensive permit statute as an attempt to address economic and racial segregation in suburban communities, Symposium, *supra* at 328, 330, it has also been suggested that the Act was motivated, in part, by political considerations stemming from passage of legislation in 1965 mandating school integration, which primarily affected urban areas. Krefetz, *supra* at 385-386.

[22]Article 60 of the Amendments to the Massachusetts Constitution, ratified in 1918, gives the Legislature authority "to limit buildings according to their use or construction to specified districts of cities and towns," but deference to local autonomy in matters of land use and zoning is well established. See

while foreclosing municipalities from obstructing the building of a minimum level of housing affordable to persons of low income. As the House Committee on Urban Affairs reported before the Act's enactment:

> "The accompanying bill, while not permitting cities or towns to unreasonably obstruct the construction of a limited amount of adequate low cost housing, encourages such communities to establish conditions on such housing which will be consistent with local needs. This measure provides the least interference with the power of a community to plan for its own future in accommodating the housing crisis which we face."[23]

1969 House Doc. No. 5429, at 2.

Thus, central to the legislative scheme is the requirement that an override of a local zoning authority's decision to deny an application to build affordable housing is available only to the extent that a city or town has not met its share of affordable housing units as delineated in the Act. See G. L. c. 40B, § 20 (defining minimum requirements). See also *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 366 (1973). Once a town has met its minimum obligations, local zoning requirements and regulations are deemed "consistent

Symposium, *supra* at 328. Indeed, the Legislature has delegated almost entirely its constitutional zoning authority to cities and towns. See 760 Code Mass. Regs. § 30.01(1) (1993) ("The General Court has chosen to delegate this [art. 60] authority almost entirely to the cities and towns instead of exercising it more directly through a state agency"). Moreover, under the Home Rule Amendment, art. 89 of the Amendments to the Massachusetts Constitution, towns generally are no longer required to seek authority from the State in order to impose controls relative to zoning. *Baldiga* v. *Board of Appeals of Uxbridge*, 395 Mass. 829, 834 n.5 (1985). General Laws c. 40A itself expressly recognizes local autonomy in dealing with land use and zoning issues. *Id.* at 834. See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 368 (1973); *Burnham* v. *Board of Appeals of Gloucester*, 333 Mass. 114, 117 (1955) (zoning "has always been treated as a local matter and much weight must be accorded to the judgment of the local legislative body"); Symposium, *supra* at 345-354. See also *Trustees of Tufts College* v. *Medford*, 415 Mass. 753 (1993) ("legitimate municipal concerns . . . typically find expression in local zoning laws").

[23]1969 House Doc. No. 5429, in modified form, became St. 1969, c. 774, codified at G. L. c. 40B, §§ 20-23. See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, *supra* at 342-343, 351.

with local needs," *id.* at 367, and the HAC is without authority to order a local zoning board to issue a comprehensive permit. See *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.,* 385 Mass. 651, 657 (1982). To the extent that a city or town does not have an adequate supply of affordable housing (measured in the Act as a percentage of existing housing or of land in each town) its local autonomy in zoning matters is curtailed. Once its obligation is met, the override power delegated to HAC is extinguished.

Viewed in this light it is anomalous to suggest, as the owner does, that the legislation provides a temporal, short-term fix of insufficient affordable housing at the expense of local autonomy. Rather, the Act reflects a legislative intent to provide an incentive to developers to build affordable housing in cities and towns that are deficient in affordable housing, and a developer's commitment to help a city or town achieve its statutory goal is the raison d'etre for the override of inhibiting zoning practices.[24] But if housing developed under a comprehensive permit is "affordable" only temporarily (fifteen years in this case, according to the owner), a city or town may never achieve the long-term statutory goals: each time an affordable housing project reverts to market rentals, the percentage of low income housing units in a municipality decreases, the percentage of market rate units increases, and access to a new round of comprehensive permits is triggered. We see nothing to suggest that the Legislature had in mind such an endless revolving cycle, or contemplated that over time an ever-increasing number of multi-family buildings could be constructed on vacant land in areas zoned for single-family homes, as multi-family housing buildings were first added to and then subtracted from a town's statutory goal.[25,26]

The Act also embodies a legislative judgment that a particular

[24] In its application to the Zoning Board of Appeals, the owner noted the shortage of low and moderate income housing in Wellesley, adding that the proposed project "represents a modest but nevertheless important proposal to meet a portion of this need."

[25] All affordable housing projects are treated in the same manner regardless whether they include units to be made available at fair market value. G. L. c. 40B, § 20. Thus "[a]ll the units in a low or moderate income housing development, whether or not they receive rent subsidies, count toward a municipality's minimum housing obligation." *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.,* 385 Mass. 651, 659 n.7 (1982). As Wellesley

site shall be accorded special zoning treatment (at variance with local requirements) in order to serve the general welfare by providing affordable housing in those cities and towns with an insufficient affordable housing stock. See *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, *supra* at 363. The special treatment is warranted "only when it serves the public interest," or "general welfare." *Id.* That public interest is no longer served when affordable units are converted to market rents. We agree with Wellesley that the override of local zoning requirements (the entitlement to "special treatment") is valid only to the extent that the public interest is served. Thus, unless otherwise expressly agreed to by a town, so long as the project is not in compliance with local zoning ordinances, it must continue to serve the public interest for which it was authorized.

The owner argues that the interpretation of the Act we now adopt is inconsistent with existing State and Federal housing construction subsidy programs. It points out that the Act defines low and moderate income housing by reference to State and Federal construction subsidy programs that permit termination of affordable units after passage of a "cliff" date, G. L. c. 40B, § 20. The reference to Federal or State construction subsidy programs is more properly viewed as a statutory mechanism to determine the threshold eligibility for the developer of a housing project to seek a comprehensive permit.[27] The Legislature was free to invoke Federal and State standards to define "low

points out, the comprehensive permit issued in this case increased Wellesley's stock of affordable housing by nine units, and its over-all stock of housing by thirty-six units; if fifteen years later (on the "cliff" date, July 8, 2000) the owner were permitted to convert all affordable units to market rate units, Wellesley would retain the larger housing stock (thirty-six units) and a smaller ratio of affordable units. Under the statutory scheme contained in G. L. c. 40B, § 20, by 2000, Wellesley would be further behind in meeting its goal of ten per cent of housing stock affordable to low and moderate income persons.

[26]The owner's interpretation also leaves towns such as Wellesley vulnerable to the terms of financing agreements over which it has no control. Thus, as happened in this case, a developer and financing agency could agree to limit the duration of affordability by a right of early prepayment, subject to any statutory restriction.

[27]We find it instructive that, in its decision ordering Wellesley to issue the permit to the owner, HAC noted that "the MHFA mortgage program, which subsidizes projects which contain units at low, moderate and market rate rentals, is a program which comes within the definitions of 'low and moderate

or moderate income housing" without incorporating the afford-
ability expiration terms of such programs. See, e.g., *Parker Af-
filiated Cos.* v. *Department of Revenue*, 382 Mass. 256, 262
(1981) (rejecting taxpayer's request to "interject the entire
Federal symbiosis" into State law, and noting that State is free
to import some but not all Federal standards). Moreover, the
terms of construction subsidy programs (Federal and State) are
not all the same,[28] and fluctuate over time. As cities and towns
are not parties to the construction subsidy agreements, we think
it unwise to read into the legislation a requirement that they be
bound by those agreements. Had the Legislature intended
financing agreements between State or Federal funding agencies
and third-party owners to govern the terms of a comprehensive
permit, it could have made that explicit. See, e.g., G. L. c. 23B,
§§ 25-27 (SHARP Act) (defining time periods for maintaining
affordability).[29] The Act is not a construction subsidy program;
it provides no funding to developers. Compare note 19 with

income housing' as set out in G. L. c. 40B, § 20, and that the . . . project,
which is financed under that program, *is eligible for a Comprehensive Permit*"
(emphasis added).

[28]In this case the owner obtained more than one type of subsidized construc-
tion financing, and the agreements are not necessarily consistent as to when
the affordability restrictions might end. See note 15, *supra*.

[29]We also do not agree with the owner that HAC's regulations, or those of
the Department of Housing and Community Development (department), limit
the affordability requirement to the term established in the construction financ-
ing documents. Title 760 Code Mass. Regs. §§ 30.00 (1993) relates to the
committee's procedural regulations regarding applications for comprehensive
permits. See 760 Code Mass. Regs. § 31.01(b) (2001) (to qualify for
comprehensive permit application, or to proceed before HAC, project must be
"fundable" by subsidy program); 760 Code Mass. Regs. § 31.04 (2001)
(rebuttable "presumption that latest [d]epartment Subsidized Housing Inven-
tory contains an accurate count of low and moderate income housing").

The owner also relies on the department's Chapter 40B subsidized housing
inventory (July 1, 1997) that contains "the percentage of low or moderate
income housing for purposes" of the Act. With respect to time limitations for
inclusion in the inventory, the accompanying notes provide:

"Unless the regulations governing the subsidy program provide otherwise,
units are counted as low and moderate income housing for the period for
which affordability is preserved (lock-in period) as described in the Regula-
tory Agreement . . . in the use restrictions or re-sale controls. If an initial
lock-in period is extended, the units continue to be counted during the
extended period. If the use restrictions or re-sale controls are released or
become void for any reason, the units continue to be counted for the remainder

note 20, *supra.* The goal is to increase the supply of affordable housing and to locate that housing in communities where there is a particular shortage of housing for persons of low income. If a developer constructs affordable housing without the significant benefits of a comprehensive permit, it may enjoy economic benefits not available under the restrictions imposed by the Act. But a developer who obtains the benefits of a comprehensive permit remains subject to the restrictions imposed by the Act, so long as the project is not in compliance with local zoning requirements.

Nor is there merit to the owner's claim that the comprehensive permit itself provides that the MHFA subsidy agreements set the date for expiration of the affordability requirements of the project. The owner points out that the permit was issued "in accordance with [the owner's] application," and that the application stated in relevant part:

> "Cedar Street Associates will by the terms of the financing as required by the Massachusetts Housing Finance Agency . . . agree contractually to limit its return on investment during the term of the mortgage to be obtained from the Massachusetts Housing Finance Agency. . . . The occupants of the proposed building will be subject to the income limitations of the State and Federal programs under which their dwelling units are subsidized and to the additional regulations of the financing agency."

That provision, like the Act's definition of low and moderate income housing, defines the threshold eligibility level for tenants seeking access to the affordable units. It does not determine whether or when the affordable restriction will expire.

Last, the owner contends that the Legislature's intent was to ameliorate the zoning barriers to the *construction* of low and

---

of the lock-in period."

However, although the listing is generally accurate as a reference, the accompanying notes also provide that the inventory "cannot provide a conclusive indication of whether individual projects or units will be counted toward the 10% goal." Indeed, as noted above, the regulations promulgated by the department provide only that there is a rebuttable presumption that the inventory contains an accurate count. 760 Code Mass. Regs. § 31.04(1)(a). Moreover, HAC expressly disavows any intent on its part that its regulations be interpreted to impose an expiration date on comprehensive permit projects.

moderate income housing in each municipality. To achieve this legislative purpose, it continues, the Legislature intended to provide an economic incentive to owners by permitting them to convert affordable units (which may have lower rates of return for owners) to market rate units on satisfaction of applicable subsidized construction financing.[30] Similarly, the owner argues, the Legislature sought to increase the stock of affordable housing when it lowered the minimum construction financing term from twenty to fifteen years. See St. 1983, c. 574, §§ 19, 20. This, it contends, created incentive for owners because of the shorter period necessary to obtain market rents.

Whatever the merit of these arguments concerning construction financing subsidies from State and Federal authorities, they do not vitiate the restrictions that attach to comprehensive permits. Not every developer of housing for persons of low income will seek a comprehensive permit. It may be that a comprehensive permit is essential for the construction of some affordable housing projects because of local zoning restrictions, and it may be that, in those situations, the absence of an affordability restriction expiration operates as an economic disincentive to developers to build affordable housing. The solution to that problem, however, lies with the Legislature.

*Judgment affirmed.*

---

[30]We recognize that the purpose of subsidized construction financing is to permit the "saving in interest . . . to be applied in part (but not entirely) to making possible lower rentals to 'low income' tenants." *Massachusetts Hous. Fin. Agency* v. *New England Merchants Nat'l Bank,* 356 Mass. 202, 209 (1969). Presumably, the Legislature understood that, after construction financing obligations are paid off, the carrying costs of associated projects are even lower. There is nothing in the record to suggest that the project at issue here necessarily will be uneconomical if affordable units do not revert to market rate now that the construction financing obligations have been satisfied.