Town of Middleborough *v.* Housing Appeals Committee.

Town of Middleborough & another[1] *vs.* Housing Appeals Committee[2] & another.[3]

No. 04-P-839.

Plymouth. April 4, 2005. - April 11, 2006.

Present: Armstrong, C.J., Lenk, & Cowin, JJ.

Further appellate review granted, 447 Mass. 1105 (2006).

*Housing. Zoning,* Comprehensive permit, Housing appeals committee, Low and moderate income housing.

Discussion of the goals and purpose of G. L. c. 40B, §§ 20-23, the Low and Moderate Income Housing Act. [42-43]

The housing appeals committee in the Department of Housing and Community Development properly ordered a comprehensive permit to issue for a project including affordable housing, where the fund program that was the ultimate source of funds for the developer of the project could be considered a government subsidy for purposes of G. L. c. 40B, in that the government granted tax exempt status to the members of the banking system that operated the fund program, and also exempted from taxation the debt instruments of those member banks. [43-50]

In a civil action to review an order of the housing appeals committee in the Department of Housing and Community Development (committee) issuing a comprehensive permit for a project including affordable housing, the judge properly concluded that the developer of the project was not ineligible to apply for a comprehensive permit [50-51]; moreover, there was no basis in the record for concluding that the permit was invalid because the developer had misrepresented its intentions with respect to the development [51]; finally, there was no denial of due process in the manner in which the committee took evidence [51-52].

Civil action commenced in the Superior Court Department on August 12, 2002.

The case was heard by *Gary A. Nickerson,* J., on motions for judgment on the pleadings.

*Jonathan D. Witten* (*Barbara M. Huggins* with him) for the plaintiffs.

[1]Board of Appeals of Middleborough.

[2]Of the Massachusetts Department of Housing and Community Development.

[3]Delphic Associates, LLC.

*Pierce O. Cray*, Assistant Attorney General, for Housing Appeals Committee.

*Joseph J. Czerwonka* for Delphic Associates, LLC.

Cowin, J. Following the denial by the board of appeals of Middleborough of the application of Delphic Associates, LLC (Delphic), for a comprehensive permit for a project including affordable housing, see G. L. c. 40B, §§ 20-23, Delphic appealed to the housing appeals committee (committee) in the Department of Housing and Community Development, which, after a hearing, reversed the board of appeals and ordered the permit to issue. The plaintiffs, the board of appeals and the town of Middleborough (collectively, Middleborough), thereupon commenced the present proceeding for judicial review of the committee's decision. A judge of the Superior Court affirmed the committee's decision, and Middleborough filed a timely notice of appeal.

Middleborough challenges the determination of the Superior Court judge and the committee on four grounds. Its principal contention is that Delphic's proposed project is not eligible for a comprehensive permit because it does not include "housing subsidized by the federal or state government," and thus does not come within the definition of "low or moderate income housing" as appearing in G. L. c. 40B, § 20, inserted by St. 1969, c. 774, § 1. Middleborough argues further that the committee ordered issuance of a permit to a nonexistent entity; that the committee's decision assures only subdivision of the land and does not require construction of affordable housing units; and that there was a denial of due process because only one member of the committee heard the evidence, and he made no preliminary report to the other committee members who cast votes.

In determining whether this project includes "housing subsidized by the federal or state government," a requirement for issuance of a comprehensive permit under G. L. c. 40B, §§ 20-23, we have examined with care the arguments, proffered by Delphic and by the Attorney General on behalf of the committee, in support of the proposition that there is such a subsidy. Those arguments are based in large part on a decision of the committee itself. See Stuborn Ltd. Partnership *vs.* Barn-

stable Bd. of Appeals, Housing Appeals Committee, No. 98-01 (March 5, 1999) (Stuborn). For reasons that we set forth below, we are not persuaded by much of the analysis articulated in the Stuborn decision. That, however, does not end the matter, for there are other grounds, not developed further by the parties here, for concluding that a Federal subsidy is present. We decide further that Middleborough's remaining objections to issuance of the comprehensive permit have no merit, and we accordingly affirm the judgment of the Superior Court.

1. *Material facts.* The material facts are not disputed. Delphic and Paul E. Cusson filed with the board of appeals an application for a comprehensive permit to develop a parcel of approximately four acres in a rural residential district (so denominated by the town's zoning by-law) of Middleborough. The plan called for subdivision of the parcel into ten lots, seven for construction of market-rate residences, while three were reserved for construction of affordable housing. Delphic informed the board of appeals that the project was eligible for funding under the so-called "New England Fund" of the Federal Home Loan Bank of Boston, and provided a letter from Norwood Cooperative Bank, a member bank, confirming that eligibility. At the time of Delphic's application, the parcel in question was owned by Bryant Realty Trust. Delphic presented to the board of appeals an executed purchase and sale agreement whereby Bryant Realty Trust agreed to sell the parcel to P&C, Inc., a corporation to be formed with Cusson (the co-applicant with Delphic) as president and treasurer.

The board of appeals denied Delphic's application on the grounds that the proposed site did not meet the minimum frontage requirement and that the parcel had earlier been designated as a lot on which building could not take place. Delphic proceeded to the committee, where a public hearing was conducted. Although the committee has five members, only the chairman was present to conduct the hearing and listen to the evidence.[4] Thereafter, the committee issued a decision signed by all five members unanimously reversing the local action and directing that the comprehensive permit be issued. The Superior

---

[4] A site visit also took place.

Court judge agreed, and Middleborough's appeal therefrom brings the case to this court.

2. *Subsidized housing.* General Laws c. 40B, §§ 20-23, the Low and Moderate Income Housing Act, restrains municipalities from erecting artificial barriers to the construction of such facilities. See *Planning Bd. of Hingham* v. *Hingham Campus, LLC,* 438 Mass. 364, 369-370 (2003). The goal of c. 40B is the fostering of a Statewide policy encouraging the creation of low and moderate income housing by overriding municipal hostility previously effectuated through traditional permit-granting proceedings. The purpose of these sections is the provision of "relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing." *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership,* 436 Mass. 811, 814 (2002), quoting from *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 354 (1973). Without questioning the obviously laudable objectives of the legislation, we recognize that it constitutes a supplanting of governmental powers traditionally exercised at the municipal level, and presume that the Legislature took care in delineating precisely the subjects upon which each level of government was entitled to act. We therefore examine the language of the statute, in light of its purpose, as well as existing interpretations of it, to determine how the Legislature intended State authority on the matter to operate.

The principal operating provision is found in G. L. c. 40B, § 21, as amended by St. 1975, c. 808, § 4, which provides that "[a]ny public agency or limited dividend or nonprofit organization proposing to build low or moderate income housing may submit to the board of appeals, established under section twelve of chapter forty A [i.e., the local zoning board of appeals or its equivalent], a single application to build such housing in lieu of separate applications to the applicable local boards."[5] The board of appeals then seeks recommendations from the other local

---

[5]The "local boards" referred to are defined as "any town or city board of survey, board of health, board of subdivision control appeals, planning board, building inspector or the officer or board having supervision of the construction of buildings or the power of enforcing municipal building laws, or city

boards, conducts a public hearing, "and shall have the same power to issue permits or approvals as any local board or official who would otherwise act with respect to such application." G. L. c. 40B, § 21. The board of appeals may impose conditions on its awards of permits and approvals. *Ibid.* Any person aggrieved by the issuance of the comprehensive permit may appeal directly to the Superior Court pursuant to G. L. c. 40A, § 17, which governs judicial review of zoning decisions. *Ibid.* However, if a permit application "is denied, or is granted with such conditions and requirements as to make the building or operation of such housing uneconomic," the applicant may appeal to the committee, which, on appropriate findings, may direct the board of appeals to issue the comprehensive permit or to relax or eliminate the challenged conditions. See G. L. c. 40B, §§ 22, 23, as amended by St. 1998, c. 161, §§ 260, 261. Any party may seek review of such a committee decision in the Superior Court "in accordance with the provisions of [G. L. c. 30A]." G. L. c. 40B, § 22.

The comprehensive permit procedure governs applications to build "low or moderate income housing." G. L. c. 40B, § 21. It is not otherwise available. "Low or moderate income housing" is a defined term for purposes of G. L. c. 40B, and means "any housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any nonprofit or limited dividend organization." G. L. c. 40B, § 20. A regulation of the committee essentially reflects the statute. See 760 Code Mass. Regs. § 30.02 (2000). The present dispute focuses, as it has for some time before the committee, on what is required for a housing project to qualify as one "subsidized by the federal or state government."

Middleborough asserts that the comprehensive permit procedure is inapplicable in this case because the New England Fund loan is not a "subsidy" provided by the Federal or State government, and thus a necessary condition to Delphic's right to proceed under G. L. c. 40B is absent. In this regard, the committee has previously considered the status of New England

council or board of selectmen." G. L. c. 40B, § 20.

Fund projects. The committee has described the funding process as follows: "Under the [New England Fund], the Federal Home Loan Bank of Boston advances funds to one of its member banks . . . , which in turn makes a construction loan to a developer [at] a below-market interest rate." Stuborn, *supra* at 3. The committee acknowledges that the Federal Home Loan Bank of Boston receives no direct Federal funding. *Id.* at 11. None of the parties has suggested that there is any State funding in the program either. This is apparently the pattern in the present case, where the plan is for the Federal Home Loan Bank of Boston to advance funds to Norwood Cooperative Bank, a member bank, which would in turn make a loan with a below-market interest rate to Delphic or its nominee.

The committee has concluded that the arrangement described above satisfies the definition of G. L. c. 40B, § 20, that "low or moderate income housing" is, among other things, "housing subsidized by the federal or state government." Its views on the subject are expressed most comprehensively in the Stuborn decision, *supra.* The committee has consistently maintained its position on the subject, and as the agency in charge of the program, its interpretation of the statute is entitled to respect. See *Hotchkiss* v. *State Racing Commn.*, 45 Mass. App. Ct. 684, 691-692 (1998).

In the Stuborn decision, the committee, faced with the assertion by a local board of appeals that the New England Fund housing program is not a subsidy program, and therefore ineligible as a basis for issuance of a comprehensive permit under G. L. c. 40B, characterized the New England Fund as "a relatively new housing program . . . structured differently from the programs under which housing has traditionally been built using comprehensive permits." Stuborn, *supra* at 2. The committee concluded that the New England Fund "conforms to the requirements of the comprehensive permit process." *Ibid.* It did so by relying on its own past decisions, stating that "these cases provide ample precedent for a liberal application of our regulations to permit the entire comprehensive permit process to evolve in tandem with the changing world of housing subsidies." *Id.* at 6. Among the changes noted by the committee were the increasing minimization of cash subsidies and bureaucratic supervision and their replacement by market forces. *Id.* at 6-7.

The committee then moved to a consideration whether the proposed housing development satisfied the jurisdictional requirements of G. L. c. 40B. The committee concluded that the proposed development complied with a number of the statutory requirements, including that the funds would be used for housing construction, see Stuborn, *supra* at 8; the affordable housing would be available only to those meeting appropriate income guidelines, the proportion of affordable housing within the development project was acceptable, and the affordable housing would remain in that status for an appropriate period, see *id.* at 8-11; and the Federal Home Loan Bank of Boston had sufficient characteristics of a government agency that the New England Fund qualified as a Federal program, see *id.* at 11-16.

It is with the committee's treatment of the statutory requirement that the housing in question be "subsidized" by the Federal or State government that the parties principally disagree. In the Stuborn decision, as here, funds for the development were lent by a member bank in the Federal Home Loan Bank system, which member bank in turn borrowed the funds from the Federal Home Loan Bank of Boston. As indicated, no portion of the loan derived from direct Federal funding. We read that to mean that the loan included no component reflecting revenues obtained by the Federal government in exactions from its citizens, whether by means of taxation, fees, or otherwise. Nevertheless, the committee was satisfied that the program was "subsidized" by the Federal government because "financing will be provided at a low interest rate, and it is generally understood that 'the funds handled by these banks are . . . public funds.' " Stuborn, *supra* at 11-12, quoting from *Fahey* v. *O'Melveny & Meyers*, 200 F.2d 420, 445 (9th Cir. 1952). Elsewhere, the committee defined "public funds" as funds in which no one has a "private interest." Stuborn, *supra* at 16.

The committee buttressed its view that the New England Fund is a program "subsidized" by the government by likening it to the housing program carried out by the Massachusetts Housing Finance Agency (MHFA). Stuborn, *supra* at 12. See St. 1966, c. 708, as amended through St. 2003, c. 34, §§ 1, 2. In the Stuborn decision, the committee pointed particularly to

the statement of the Supreme Judicial Court in *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 656 (1982), that "a low interest mortgage from MHFA is a subsidy under G. L. c. 40B, § 20." The committee relied also on *Charlesbank Apartments, Inc.* v. *Boston Rent Control Admn.*, 379 Mass. 635, 636, 638 (1980), which characterized the mortgage insurance provided by the Federal government under § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715(1)(d)(3) (1979), as a subsidy, as well as on its own regulation codified at 760 Code Mass. Regs. § 30.02 (1999) (defining "subsidy" as "the grant, through a federal or state housing program to assist the construction of low or moderate income housing . . . , of direct financial assistance; of indirect financial assistance through insurance, guarantees, or other means; of in kind assistance; of technical assistance; or of other supportive services").

A considerable portion of the committee's reasoning appears to be an effort to rationalize the New England Fund program as one that partakes of a Federal subsidy as the term is used in G. L. c. 40B, § 20. We suggest respectfully that the committee's statement in Stuborn, *supra* at 7, that "the [New England Fund] is the sort of affordable housing subsidy program that is crucial to current efforts to fill the need for affordable housing" reveals that its analysis has been propelled, at least in part, by policy considerations rather than exclusive adherence to the language of the statute. General Laws c. 40B, § 20, defines "low or moderate income housing" as, inter alia, "housing subsidized by the federal or state government." A "subsidy" is "a grant or gift of money or other property made by way of financial aid: as . . . money granted by one state to another . . . [or] a grant of funds or property from a government . . . to a private person or company . . . ." Webster's Third New Intl. Dictionary 2279 (1995). We acknowledge that the concept of a subsidy is not restricted to writing a check. See, e.g., *Charlesbank Apartments, Inc.* v. *Boston Rent Control Admn.*, 379 Mass. at 638 (mortgage insurance). It does, however, require that something of economic value is made available, and that it be provided, at least in this context, by the Federal or State government.

Thus, the question is whether the New England Fund program, which provides resources in the form of loans to member banks of the Federal Home Loan Bank system, which in turn lend the funds to developers, is a Federal subsidy as envisioned by G. L. c. 40B, § 20. The parties agree that there is no Federal money as such in the program. The twelve regional banks of the Federal Home Loan Bank system, while federally chartered, are privately capitalized, privately owned, and managed independently of the government.[6] See 12 U.S.C. §§ 1426, 1427 (2001); *Andrews* v. *Federal Home Loan Bank of Atlanta,* 998 F.2d 214, 216 (4th Cir. 1993) (stating that bank is "more like a private entity than . . . part of the federal government"). The regional banks are capitalized by the investments of member banks and by retained earnings. See 12 U.S.C. § 1426. The members receive stock in the regional bank, and are paid dividends. See 12 U.S.C. §§ 1426(a)(4), 1436. The regional banks are empowered to borrow money in the capital markets and to issue debentures, bonds, or other evidences of obligation therefor. See 12 U.S.C. § 1431(a). These obligations are not guaranteed by the Federal government. According to its annual report of 2003, the Federal Home Loan Bank of Boston had net income of $75.8 million in 2002, and $91.6 million in 2003.

Relying largely on the Stuborn decision, the defendants essentially recycle the propositions advanced by the committee in that ruling. We need not pause long at the committee's explanation why the Federal Home Loan Bank of Boston is a Federal agency. Stuborn, *supra* at 13-16. There are obviously different opinions on the subject. Compare *Fahey* v. *O'Melveny & Meyers,* 200 F.2d at 454 (describing these banks as governmental banking agencies), with *Andrews* v. *Federal Home Loan Bank of Atlanta, supra* (bank more like private entity). Elsewhere, the committee reasoned that an entity "may be considered public or private depending on the context in which the issue arises," Stuborn, *supra* at 14, and concluded that, for present purposes, the Federal Home Loan Bank of Boston has sufficient character-

---

[6]We note that the Federal Home Loan Bank Board appoints six of the fourteen directors of each regional bank for three-year terms, see 12 U.S.C. § 1427(a), (d), but that board is not otherwise engaged in the regional bank's operations.

istics of a Federal agency that the New England Fund is a program of the Federal government. *Id.* at 16.[7]

However, even if we were to accept the proposition that the Federal Home Loan Bank of Boston is a Federal instrumentality, and that consequently the New England Fund is a program of the Federal government, that determination by itself would not end the case. The statute requires not just governmental involvement, but a governmental subsidy. We return to the Stuborn decision to examine the treatment by the committee of that question.

The Stuborn decision places considerable weight on the fact that a portion of the funds of the regional banks are designated for a certain, defined public purpose, specifically, the financing of low or moderate income housing, and that the effectuation of such public purpose is a governmental function. That may well be, but if the governmental participation is limited to a definition of purpose and moral support, that is not a subsidy. Likewise, the committee's characterization of the funds in question as "public" because no entity has a private interest in them is not accurate. The regional bank, the member bank, and the developer (at least in many cases, including this one) are all profit-making institutions, which make money on these transactions. Finally, the committee relies on the fact that the regional bank is supervised by the Federal Housing Finance Board, "an independent agency in the executive branch of the Government," 12 U.S.C. § 1422a(a)(2)-(3), although the committee acknowledges that the board does not involve itself in day-to-day supervision of the New England Fund. Again, supervision does not constitute a subsidy. All sorts of private profit-making ventures are regulated by the government without any suggestion that by doing so the government is subsidizing those enterprises. Consequently, we are not persuaded that any

[7]In arriving at its determination that the Federal Home Loan Bank of Boston is a public agency, the committee applied the four factors set forth in *Massachusetts Bay Transp. Authy. Retirement Bd.* v. *State Ethics Commn.*, 414 Mass. 582, 587, 589-592 (1993), specifically, whether the agency is authorized legislatively; whether it performs some "essentially governmental function"; whether the funds it dispenses are public funds; and whether there is at least some degree of governmental supervision. See Stuborn, *supra* at 15-16.

of these factors reasonably translate into the existence of a Federal subsidy under G. L. c. 40B, § 20.

In our view, the government may create an agency, or it may authorize or direct an existing agency to carry out a particular program. But if the Federal or State government does not contribute something of value to the effort, there is nothing that qualifies as a government subsidy. Here, the funds advanced to the member bank and ultimately to the developer are all privately generated. That the initial source of the funds may be considered a government agency with a statutory mandate does not by itself establish that the funds loaned are a government subsidy.

We are not prepared to assume that the Legislature had something unusual in mind when it limited the c. 40B program to "housing subsidized by the federal or state government." It is far more likely that the Legislature, having provided for the supplanting of local control by State authority, decided that it was desirable to limit c. 40B's restrictions on local authority to projects that command sufficient commitment from the Federal or State government such that the government is willing to contribute cash or other items of value to the effort. A judgment that such a commitment would reflect both that the project featured reliable sponsorship and that it would be appropriately supervised is certainly reasonable. In any event, the requirement is in the statute, and it is proper that it be enforced.

We therefore inquire whether there are any other features of the New England Fund program, as operated by the Federal Home Loan Bank of Boston, that would satisfy the concept of a government subsidy. There are two factors that appear to us to be meaningful. While they are mentioned briefly by the committee in the Stuborn decision, they are not pressed either by the committee or by Delphic in the present case. Nevertheless, they appear to constitute a commitment on the part of the Federal government to contribute something of value to the program.

To begin with, "[t]he bank [meaning the regional bank, in this case the Federal Home Loan Bank of Boston], including its franchise, its capital, reserves, and surplus, its advances, and its income shall be exempt from all taxation now or hereafter

imposed by the United States, by any Territory, dependency, or possession thereof, or by any State, county, municipality, or local taxing authority."[8] 12 U.S.C. § 1433. Thus, the regional bank from the beginning is relieved of a burden routinely borne by private businesses, thereby increasing its ultimate profits and enabling it more easily to make loans at favorable rates to its members. We see no material fiscal difference between the government paying out funds or forgoing tax revenues it would otherwise have received, and we conclude that the tax exemption constitutes a government subsidy.

Likewise, "[a]ny and all notes, debentures, bonds, and other such obligations issued by any [regional] bank, and consolidated Federal Home Loan Bank bonds and debentures, shall be exempt both as to principal and interest from all taxation (except surtaxes, estate, inheritance, and gift taxes) now or hereafter imposed by the United States, by any Territory, dependency, or possession thereof, or by any State, county, municipality, or local taxing authority." *Ibid.* It is beyond dispute that the tax-free characteristics of the banks' debt instruments render them particularly attractive to a segment of the capital market, and facilitate the ability of the regional bank to raise, at lower than market rates, the capital that it then lends for purposes of the New England Fund program. The agreement by the government to forgo tax revenues from the holders of the debt instruments is a subsidy. See, e.g., *Massachusetts Hous. Fin. Agency* v. *New England Merchs. Natl. Bank*, 356 Mass. 202, 207, 209 (1969).

Accordingly, for the reasons stated, we are satisfied that the financial participation of the government in the form of the above-described tax exemptions is sufficient to constitute a governmental subsidy for purposes of c. 40B. We emphasize, however, that the question turns on the existence of such governmental participation. Were that participation to be removed, none of the remaining grounds relied on by the committee would provide an adequate basis for a finding that a government subsidy was present.

3. *Other issues.* We agree with Delphic, the committee, and

---

[8]An exception is that the bank's real property remains subject to State or local taxation according to its value. 12 U.S.C. § 1433.

the Superior Court on the remaining issues. In our view, none of Middleborough's remaining objections would be proper grounds for denying an otherwise legally conforming application under G. L. c. 40B.

First, Middleborough notes that Delphic was itself ineligible to apply for a comprehensive permit because it is not a public agency or a limited dividend or nonprofit organization. See G. L. c. 40B, § 21. Because this is in fact the case, Delphic provided that the permit should issue to an entity yet to be formed called P&C, Inc. Middleborough argues that the committee therefore ordered issuance of a permit to a nonexistent entity without standing to appeal the denial by the board of appeals in the first place. We see no merit in the argument. We agree with the committee that where, as here, there is no deception involved, the final structure of the entities that enter the arrangement is of little consequence as long as the ultimately responsible party is one authorized under G. L. c. 40B, § 21, to obtain a comprehensive permit. Furthermore, there is nothing in the regulatory scheme that precludes transfer of a permit when appropriate. See 760 Code Mass. Regs. § 31.08(5) (2000).

Next, Middleborough contends that the comprehensive permit is invalid because it authorizes subdivision of the parcel in question into ten lots, with three reserved for affordable housing, but does not require that there be actual residential construction on the lots. There is no basis in the record whatever for a conclusion that Delphic has misrepresented its intentions with respect to the development. The order of the committee directing that the permit issue is clearly predicated on the understanding that there will be residential construction, and the order was entered on the basis of a record that included architectural drawings and building specifications. Delphic has offered voluntarily to execute a deed rider and regulatory agreement. In the final analysis, in the highly unlikely event that Delphic reneges on its commitment, the comprehensive permit is subject to revocation.

Finally, Middleborough challenges issuance of the comprehensive permit on the grounds that only the chairman of the committee heard the evidence, he filed no preliminary report with the other committee members, and the committee has not

demonstrated that at least a quorum of its membership found the relevant facts and rendered the conclusions. Middleborough acknowledges that only one member need be present at the hearing. It then, mistakenly in our view, characterizes that member (in this case, the chairman) as a hearing officer obligated to issue a written report of findings of fact and recommendations. See 760 Code Mass. Regs. § 30.09(5)(i) (2001).[9]

The chairman did not sit as a hearing officer, and he was under no obligation to report to the other members. The hearing was conducted pursuant to 760 Code Mass. Regs. § 30.09(5)(a) (2001), which provides that there may be a hearing before the whole committee, one or more of its members, or a hearing officer appointed by the chairman. Nothing in the record indicates that the chairman appointed himself a hearing officer; it is, rather, clear that he sat, as he was entitled to do, as a single member. Accordingly, the requirement of 760 Code Mass. Regs. § 30.09(5)(i) (2001) that a hearing officer render proposed findings and a recommended disposition is inapplicable. Where a single member conducts the hearing, he must render a tentative decision only if a majority of the committee have neither heard nor read the evidence. See G. L. c. 30A, § 11(7); 760 Code Mass. Regs. § 30.09(5)(i) (2001). Here, the decision, signed by each member of the committee, states that it is based on a review of the entire record. We have been shown no reason why that representation should not be accepted.

*Judgment affirmed.*

---

[9]We note that Middleborough at no time requested such a preliminary report during the committee proceeding.