### Board of Appeals of Woburn *vs.* Housing Appeals Committee[1] & others[2] (and two companion cases[3]).

Suffolk. February 4, 2008. - June 10, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Cordy, JJ.

*Housing. Zoning,* Low and moderate income housing, Housing appeals committee, Comprehensive permit.

Discussion of the comprehensive permit act, G. L. c. 40B, §§ 20-23, which provides relief from exclusionary zoning practices which prevent the construction of low and moderate income housing. [582-584]

The housing appeals committee of the Department of Housing and Community Development (committee) exceeded its statutory authority when it revised the conditions imposed by a local zoning board of appeals (board) on a developer's proposal for a housing project, after the committee found that the board's conditions did not make the project uneconomic, where the express language of the comprehensive permit act, G. L. c. 40B, §§ 20-23, empowered the committee to order the board to modify or remove a condition or requirement only when the board's decision made the building or operation of the project uneconomic and was not consistent with local needs, and the committee could not expand those powers by recasting as a denial an approval with conditions that did not render the project uneconomic. [590-595] Marshall, C.J., concurring.

Civil actions commenced in the Superior Court Department on July 11, 2003, and October 21, 2005, respectively.

After consolidation, the cases were heard by *Christopher J. Muse,* J., on motions for judgment on the pleadings, and a motion for reconsideration was also heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Gary S. Brackett* (*Heather W. Kingsbury* with him) for Board of Appeals of Woburn.

---

[1] Of the Department of Housing and Community Development (department).

[2] Archstone-Smith Operative Trust, formerly known as Archstone Communities Trust, and its trustees.

[3] Archstone Communities Trust *vs.* Department of Housing and Community Development & others; Board of Appeals of Woburn *vs.* Housing Appeals Committee & others.

Board of Appeals of Woburn *v.* Housing Appeals Committee.

*Paul D. Wilson* (*Brian W. Blaesser & Benjamin B. Tymann* with him) for Archstone-Smith Operative Trust.

*Pierce O. Cray,* Assistant Attorney General, for Housing Appeals Committee.

The following submitted briefs for amici curiae:

*Laurel J. Francoeur* for Friends of Mary Cummings Park, Inc.

*Peter L. Freeman, Joshua Davis, Janet R. Stearns, Stephanie A. Kiefer, & Matthew J. Dunn* for Citizens' Housing and Planning Association & another.

*David S. Weiss & Michael S. Rabieh* for Massachusetts Chapter of the National Association of Industrial & Office Properties.

*Jason R. Talerman* for town of Sandwich.

*Michael E. Malamut, Martin J. Newhouse, & Jo Ann Shotwell Kaplan* for New England Legal Foundation.

CORDY, J. In these consolidated cases, we must decide whether the Housing Appeals Committee (committee) of the Department of Housing and Community Development (department) has the authority to alter the conditions placed on the approval of a comprehensive permit, where the developer has failed to demonstrate that those conditions make the housing project uneconomic. We conclude that the plain language of the comprehensive permit act, G. L. c. 40B, §§ 20-23 (act), precludes such authority.[4]

1. *Background.* a. *The Massachusetts comprehensive permit act.* The material facts are not in dispute. In order to place them in context, we describe briefly the relevant portions of the act, inserted by St. 1969, c. 774, "which [have] been thoroughly canvassed in earlier opinions." *Middleborough* v. *Housing Appeals Comm.,* 449 Mass. 514, 516 (2007), citing *Dennis Hous. Corp.* v. *Zoning Bd. of Appeals of Dennis,* 439 Mass. 71, 76-78 (2003), and *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 347-354 (1973). The primary purpose of the act is "to provide relief from exclusionary zoning practices which prevent[] the construction of badly needed low and

---

[4]We acknowledge the amicus briefs of the New England Legal Foundation; the Massachusetts Chapter of the National Association of Industrial & Office Properties; Citizens' Housing and Planning Association and Greater Boston Real Estate Board; the town of Sandwich; and Friends of Mary Cummings Park, Inc.

moderate income housing." *Taylor* v. *Housing Appeals Comm.,* *ante* 149, 151 (2008), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 354. The act allows a "limited dividend organization interested in constructing low or moderate income housing to circumvent the often arduous process of applying to multiple local boards for individual permits and, instead, to apply to the local board of appeals for issuance of a single comprehensive permit." *Middleborough* v. *Housing Appeals Comm., supra* at 516. See G. L. c. 40B, § 21. "In addition to streamlining the permitting process itself, the clear intent of the Legislature was to promote affordable housing by minimizing lengthy and expensive delays occasioned by court battles commenced by those seeking to exclude affordable housing from their own neighborhoods." *Standerwick* v. *Zoning Bd. of Appeals of Andover,* 447 Mass. 20, 29 (2006).

Consistent with these "oft-repeated objectives," *id.* at 30, the act establishes a straightforward appeals process for the applicant. G. L. c. 40B, §§ 22-23. "Whenever an application . . . is denied, or is granted with such conditions and requirements as to make the building or operation of such housing uneconomic, the applicant shall have the right to appeal to the housing appeals committee . . . ." G. L. c. 40B, § 22.[5] When a denial is reviewed by the committee, the local board of appeals has "the burden of proving, first, that there is a valid . . . local concern which supports such denial, and then, that such concern outweighs the regional housing need." 760 Code Mass. Regs. § 31.06(6) (2001).[6] That burden is consistent with the statutory language: "If the committee finds, in the case of a denial, that

[5]The term "uneconomic" is defined in G. L. c. 40B, § 20, as "any condition brought about by any single factor or combination of factors to the extent that it makes it impossible for . . . a limited dividend organization to proceed and still realize a reasonable return in building or operating such housing within the limitations set by the subsidizing agency of government on the size or character of the development or on the amount or nature of the subsidy or on the tenants, rentals and income permissible, and without substantially changing the rent levels and units sizes proposed by the . . . limited dividend organization[]."

[6]During the course of the developer's appeal from the board of appeals of Woburn's (board's) decision, the regulations governing the appeal process of the Housing Appeals Committee (committee) of the department have been revised on several occasions. See 760 Code Mass. Regs. §§ 30.00-31.00 (2001); 760 Code Mass. Regs. §§ 30.00-31.00 (2002); 760 Code Mass. Regs.

the decision of the board of appeals was unreasonable and not consistent with local needs, it shall vacate such decision and shall direct the board to issue a comprehensive permit or approval to the applicant." G. L. c. 40B, § 23. By contrast, when the developer appeals from an approval with conditions, "the applicant shall have the burden of proving that the conditions make the building or operation of the housing uneconomic." 760 Code Mass. Regs. § 31.06(3). If the applicant presents evidence sufficient to meet this burden, "the Board shall [then] have the burden of proving, first, that there is a valid . . . local concern which supports such conditions, and then, that such concern outweighs the regional housing need." *Id.* at § 31.06(7). The shifting burdens are likewise consistent with the statutory language. Section 22 of the act allows for review of an approval only when it "is granted with such conditions and requirements as to make the building or operation of such housing uneconomic." G. L. c. 40B, § 22. Section 23 empowers the committee to "order [the] board to modify or remove any such condition or requirement" only when the board's approval with conditions "makes the building or operation of such housing uneconomic *and* is not consistent with local needs" (emphasis added). G. L. c. 40B, § 23.

The structure of the act "reflects the Legislature's careful balance between leaving to local authorities their well-recognized autonomy generally to establish local zoning requirements . . . while foreclosing municipalities from obstructing the building of a minimum level of housing affordable to persons of low income" (citation omitted). *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 822-823 (2002).

b. *Facts and procedural history.* Against this backdrop, we consider the undisputed facts. The developer, Archstone-Smith Operative Trust, is a Maryland limited dividend corporation, eligible to seek a comprehensive permit under G. L. c. 40B,

§§ 30.00-31.00 (2003); 760 Code Mass. Regs. §§ 30.00-31.00 (2004). The regulations were most recently revised on February 22, 2008. See 760 Code Mass. Regs. § 56 (2008) (condensing 760 Code Mass. Regs. §§ 30.00-31.00 [2004] into one comprehensive section). The reorganized regulations are effective April 1, 2008. 760 Code Mass. Regs. § 56.08(3)(d). The revisions are immaterial to this appeal.

§ 21. On September 28, 2000, the developer applied to the board of appeals of Woburn (board) for a comprehensive permit to build 640 units of housing, of which twenty-five per cent would be affordable, on a 74.46 acre parcel of land owned by Northeastern University on Cambridge Road in Woburn.[7]

The proposed project was to consist of thirty-two twenty-unit buildings, and a 5,500 square foot recreation center. The proposal envisioned two types of residential buildings: twenty-two two-story garden apartment buildings with twelve one-bedroom units and eight two-bedroom units per building; and ten three-story split garden apartments that would include ten one-bedroom units and ten two-bedroom units per building. The proposed total "impervious" areas of the development (including the apartment building footprints, community center building, drives and parking, but excluding walkways) comprised 28.4 per cent of the site, or 21.2 acres. Proposed open space area constituted 71.6 per cent of the development, or 53.3 acres, including preserved natural wetland areas, preserved natural upland areas, and landscaped areas.

The board held nine days of public hearings on the developer's proposal, beginning on October 18, 2000, and concluding on July 25, 2001. On August 22, 2001, the board voted to grant a comprehensive permit with conditions, and issued its written decision on September 10, 2001, delineating each condition. The comprehensive permit set forth fifty conditions in total, most significantly limiting the development to 300 units instead of the 640 units proposed.[8]

On September 11, 2001, the developer appealed from the

---

[7]The property is bordered on the east by Cambridge Road (Route 3); on the north by Northeastern University's Burlington campus; on the northwest and southwest by Boston Public Park's open space land; and on the south and southeast by Sylvanus Wood Road and by Kosciusko Street. Cambridge Road is a heavily trafficked, major arterial road that intersects with Route 128 (Interstate Route 95).

[8]Among the other prominent conditions the board imposed on the project were a requirement that the affordable units be maintained in perpetuity (instead of the proposed fifteen-year period); a requirement that the distribution of affordable units among the one-bedroom, two-bedroom, and three-bedroom units approximate the same percentage distribution proposed by the developer for the 640-unit complex; a requirement that the construction of the project be completed in phases no greater than 16.24 acres each year; a requirement that the developer

board's decision to the committee. The committee specially designated a hearing officer to hear evidence and recommend a decision for the committee's review. The hearing officer conducted a site visit and held twenty-seven days of evidentiary hearings, during the course of which 170 exhibits were admitted in evidence.

On June 11, 2003, the committee issued its decision.[9] Pursuant to §§ 22 and 23 of the act, and 760 Code Mass. Regs. § 31.06(3) (2001), the committee first reviewed the conditions imposed by the board to determine whether they rendered the development uneconomic, and found that the developer had "not proven that the conditions make the building or operation of the housing uneconomic." Despite reaching this conclusion, the committee opined that neither the act nor its prior decisions "preclude[] further analysis of the [b]oard's conditions in every case in which conditions have not been proven to be uneconomic," and ruled that "when the board has not articulated a reasonable factual or legal justification for a condition, we will modify or eliminate it." Using this standard, the committee inquired whether the board's conditions were supported by legitimate local concerns that outweighed the regional need for low or moderate income housing, and concluded that several were not. The committee then removed or modified the offending conditions. Most prominently, the committee altered the board's condition limiting the development to 300 units.

---

remove or fund the replacement of a six-inch water main with a twelve-inch water main; a requirement that the developer adhere to a 300-foot buffer zone along the boundaries of the project other than Cambridge Road; a requirement that affordable units be dispersed throughout the development and constructed on a schedule of one affordable unit for each three market-rate units constructed; a requirement that the developer install sidewalks on both sides of Cambridge Road around the development, and provide a bus terminal turnaround for school children and users of public transportation; and a requirement that the buildings not exceed two and one-half stories.

[9]The committee's hearing process was a lengthy one. Title 760 Code Mass. Regs. § 30.09(4) (2001) allows the hearing officer to issue a prehearing order, which may include agreed facts, a list of contested issues of fact and law, and a list of witnesses to be called. This order was issued on February 5, 2002, and the committee's decision was issued sixteen months later. Part of the extended time line was explained by the committee: "It is also noteworthy that this may be the largest Chapter 40B proposal that has been before the [committee]."

In determining what the proper size of the development should be, the committee found "that ample evidence exists in the record to support the [b]oard's position that the 640-unit proposed development is too large [and] impos[es] significant burdens on the surrounding community."[10] It then noted that it is "rarely wise for us to sift through the evidence to attempt to identify an acceptable size ourselves," but it proceeded to do exactly that. Ultimately, the committee determined that the purchase and sale agreement for the land, entered into by the developer and Northeastern University, reflected the "developer's neutral evaluation of the carrying capacity of the site."[11] The agreement was based on development approval for the construction of 420 units, and the committee adopted that number as the "acceptable number of units for this proposal."[12]

Both the board and the developer filed complaints for judicial review in the Superior Court. The cases were consolidated, and the parties filed cross motions for judgment on the pleadings. On April 25, 2005, a judge entered an order upholding the committee's decision in part and reversing it in part. In his ruling, the judge found that while the committee expressly regarded the board's issuance of a comprehensive permit to be an approval with conditions, the committee's review was more consistent with the review given to a denial. However, the judge concluded that the committee's review was appropriate, because the condition substantially reducing the number of units was the "functional equivalent of a denial," rather than an approval with conditions.[13] Consequently, the committee could consider whether the conditions themselves were "reasonable and consistent with local needs," even though it found that those conditions did not

[10]The logical inference to be drawn from this finding is that had the board merely denied the 640-unit project, that denial would have been appropriate under the act. The parties do not contend otherwise.

[11]The board found that the developer "has shown evidence of its interest in the proposed site sufficient to qualify it as a recipient of a Comprehensive Permit. It [rather than Northeastern University] controls the proposed site . . . ." That determination was not challenged before the committee, nor is it challenged here.

[12]The committee removed several other conditions, including the 300-foot buffer zone, the two and one-half story limitation on building height, and various access road and parking restrictions.

[13]The Superior Court judge also described the board's action as a "de facto denial."

make the project uneconomic, a finding that the judge specifically determined was supported by the evidence.[14]

The judge then reviewed the committee's decision to determine whether substantial evidence existed in the record to support the committee's alteration of the size of the project. Stated otherwise, the judge reviewed the committee's revisions to determine whether the record supported its conclusion that they were more consistent with the local need for affordable housing (when balanced against Woburn's other local concerns) than the conditions originally set by the board. The judge determined that the committee's "selection of 420 units as the appropriate number of units . . . was unsupported by sufficient evidence in the record," and remanded the case to the committee to determine "an appropriate number of units given the need for affordable housing and local needs concerns."[15]

On remand to the committee, the developer contended that a 540-unit development, rather than the 640-unit development it had originally proposed, was consistent with local needs, and submitted three affidavits in support of such a development. The affidavits set out two alternative design plans for the development.[16] On July 21, 2005, the committee held a hearing, which it limited to the cross-examination of witnesses whose testimony had been prefiled.[17] On September 20, 2005, the committee is-

---

[14]The judge noted that the original proposal for 640 units (which he found functionally denied by the conditions) was "too large and burdensome on the community," and that therefore the committee was faced with either denying that proposal or modifying it "to allow for affordable housing while remaining consistent with local needs." The judge went on to conclude that the committee acted consistently with the act in choosing to "modif[y] the number of units, as well as other conditions, to allow for . . . a project that provided affordable housing while considering the local needs of Woburn." The judge cited CMA, Inc. *vs.* Westborough Zoning Bd. of Appeals, Housing Appeals Committee, No. 89-25, at 28 (June 25, 1992), for the proposition that the committee has the authority to reduce the number of units and order that a permit be issued when faced with a permit that was appropriately denied by a local board. In light of our decision, we need not consider whether such authority is consistent with the act.

[15]The judge found that the remainder of the committee's decision, including several conditions that were struck, was supported by substantial evidence.

[16]The first plan consisted of twenty-two three-story buildings; the second consisted of five four-story buildings and four three-story buildings.

[17]The board did not submit any prefiled testimony, instead choosing to rely on the existing administrative record.

sued its decision, concluding that a 540-unit development would be consistent with local needs and ordering the board to issue a comprehensive permit for a 540-unit complex. The committee's decision did not designate which of the two design plans the board should permit.

The board again appealed from the committee's decision by filing a new complaint in the Superior Court, contending, in pertinent part, that the committee exceeded its statutory power in approving a 540-unit plan on remand, because the developer's revised plan constituted a substantial change from the original proposal. See 760 Code Mass. Regs. § 31.03 (2001).[18] The board argued that the committee should have remanded the new proposal for its consideration. The judge found otherwise, declining to hold that the "540-unit plans constituted a 'substantial change' " as a matter of law. Additionally, the judge concluded that the committee's decision that a 540-unit development was reasonable and consistent with local needs was supported by substantial evidence, and that, when issuing the comprehensive permit, the board would be entitled to choose between the two 540-unit plans proposed.

The board's second complaint was consolidated with the other cases, and final judgment entered on December 28, 2006, affirming the committee's September 20, 2005, decision that ordered the board to issue a comprehensive permit for a 540-unit development. The board filed its notice of appeal, and we granted the board's and the developer's respective applications for direct appellate review.

---

[18]Title 760 Code Mass. Regs. § 31.03 (2001) states, in relevant part:

"(1) Substantial Changes. If an applicant involved in an appeal to the Committee desires to change aspects of its proposal from its content at the time it made the application to the Board, it shall notify the Committee in writing of such changes and the Committee shall determine whether such changes are substantial. If the Committee finds that the changes are substantial, it shall remand the proposal to the Board . . . .

"(2) Commentary and Examples. . . . Following are some examples of what circumstances ordinarily will and will not constitute a substantial change . . . (a) The following matters ordinarily will be substantial changes . . . 2. An increase of more than 10 [per cent] in the number of housing units proposed . . . ; (b) The following matters ordinarily will not be substantial changes: 1. A reduction in the number of housing units proposed . . . ."

2. *Discussion.* The board's principal contention on appeal is that the committee exceeded it statutory authority when it revised the conditions imposed by the board, increasing the approved project size from 300 units to 540 units, after finding that the board's conditions did not make the project uneconomic. We agree.[19]

In reviewing a committee decision, we give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30, § 14 (7). See *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 376 (1973). Yet, judicial deference to agency decisions is not without limits. *Taylor* v. *Housing Appeals Comm., ante* 149, 154-155 (2008). See *Leopoldstadt, Inc.* v. *Commissioner of the Div. of Health Care Fin. & Policy,* 436 Mass. 80, 91 (2002), quoting *Protective Life Ins. Co.* v. *Sullivan,* 425 Mass. 615, 618 (1997) (principle "one of deference, not abdication"). Here, the committee brushed aside the language of the governing statute and the regulations of the department and, in so doing, exceeded its authority.

General Laws c. 40B, § 22, provides that whenever a developer's comprehensive permit application "is denied, or is granted with such conditions and requirements as to make the building or operation of such housing uneconomic, the applicant shall have the right to appeal to the housing appeals committee." In other words, the committee may review an approval with conditions *only* if those conditions render the project uneconomic. Consistent with this statutory requirement, the department's regulations provide that the developer must demonstrate that the conditions are uneconomic before the committee considers whether they are "consistent with local needs," G. L. c. 40B, § 23. 760 Code Mass. Regs. § 31.06(3) (2001). Demonstrating that the

[19]The board also contends that the committee improperly considered the developer's proposals to develop a 540-unit complex instead of remanding the proposals to the board because the plans constituted a "substantial change," 760 Code Mass. Regs. § 31.03(1), from the original proposal. Because we decide that once the committee determined that the board's conditions did not render the development uneconomic it lacked the authority to alter or strike those conditions, we need not address whether the 540-unit proposal constituted a substantial change from the original 640-unit application.

conditions render a project uneconomic is, therefore, a necessary element of the developer's prima facie case for relief. G. L. c. 40B, §§ 22, 23. 760 Code Mass. Regs. § 31.06(3) (2001). Cf. *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 520-521 (2007) (though department denominates "fundability" as "a 'jurisdictional requirement' [it] is more properly viewed as a substantive aspect of the successful applicant's prima facie case for . . . a comprehensive permit"). Absent such a showing, the board is not required either under the act or the department's regulations to demonstrate that its conditions are consistent with local needs. Here, the committee determined that the developer failed to show that the conditions imposed by the board rendered "the building or operation of [the project] uneconomic," and its inquiry should have ended there.

Instead, the committee evaluated whether each condition was "supported by a local concern that outweighs the regional need for low or moderate income housing," see 760 Code Mass. Regs. § 31.06(7), essentially reviewing the board's approval with conditions as though it were a denial.[20] The committee now claims that this review was proper, because the board's conditions were so onerous as to be a "functional" or "de facto" denial, and points to several of its former decisions to support its contention that it has an established method of determining when the imposition of conditions should properly be considered to be a denial. In particular, it relies on Settlers Landing Realty Trust *vs.* Barnstable Bd. of Appeals, Housing Appeals Committee, No. 01-08, at 3-4 (Sept. 22, 2003) (Settlers Landing), in which the committee stated that "an arbitrary reduction in the number of units may constitute the denial of a permit," and that "when a developer challenges a board decision that significantly reduces the number of units in the development, the appropriate course is to review the decision to determine whether it manifests a reason-

---

[20]See G. L. c. 40B, § 23 ("The hearing by the [committee] shall be limited to the issue of whether, in the case of the denial of an application, the decision of the board of appeals was reasonable and consistent with local needs . . ."); 760 Code Mass. Regs. § 31.06(6) ("In the case of denial, the Board shall have the burden of proving, first, that there is a valid . . . local concern which supports such denial, and then, that such concern outweighs the regional housing need").

able basis for the reduction."[21,22] The committee argues that the Settlers Landing decision standard has the same effect as a properly promulgated regulation, and is therefore entitled to this court's deference.

There is no question that the committee's decisions, like

[21]The committee portrays the decision in Settlers Landing Realty Trust *vs.* Barnstable Bd. of Appeals, Housing Appeals Committee, No. 01-08, at 3 (Sept. 22, 2003) (Settlers Landing), as an articulation of long-standing policy. See also CMA, Inc. *vs.* Westborough Zoning Bd. of Appeals, Housing Appeals Committee, No. 89-25, at 24 (June 25, 1992) ("With regard to the proposed number of units in particular, the board should usually simply grant or deny the permit"); Georgetown Hous. Auth. *vs.* Georgetown Bd. of Appeals, Housing Appeals Committee, No. 87-08, at 21-22 (June 15, 1988) ("a reduction in the number of units, whether done in the decision itself . . . or whether this reduction appears in the decision as a condition, is always, in fact, a denial of the original application and must be examined as to whether it is consistent with local needs").

This policy, however, is not as consistent as the committee contends. In Cooperative Alliance of Mass. *vs.* Taunton Zoning Bd. of Appeals, Housing Appeals Committee, No. 90-05, at 8 n.12 (April 2, 1992), the committee noted: "[T]he legislative intent of the entire statute is to permit affordable housing without undue intrusion on local prerogatives. Thus, if the condition does not make the project uneconomic, it should be upheld even if the town cannot prove that it is consistent with local needs." The committee did not make a distinction for particularly onerous conditions or conditions that reduce the proposed number of units. *Id.* The committee also has not uniformly applied the Settlers Landing standard in cases involving unit reductions. For example, in Bay Watch Realty Trust *vs.* Marion Bd. of Appeals, Housing Appeals Committee, No. 02-28 (Dec. 5, 2005), the local board granted a comprehensive permit, but limited the proposed 192-unit development to ninety-six units. *Id.* at 1. The committee, in accordance with the act and the governing regulations, reviewed the conditions imposed by the board to determine whether they caused the project to be uneconomic, and concluded that they did. *Id.* at 22. Only then did the committee evaluate the conditions to determine whether they were consistent with local needs. *Id.* at 22-29.

[22]In the wake of the Settlers Landing decision, the department revised its regulations to reflect its newly articulated policy for evaluating certain approvals with conditions as though they were denials. Title 760 Code Mass. Regs. § 30.07(2)(d) (2004) allows an applicant to file a preliminary motion prior to its hearing before the committee "to clarify whether the Board's decision is a denial or a grant with conditions (see Settlers Landing Realty Trust v. Barnstable, No. 01-08 . . .)."

Similar language is included in the department's most recent regulations, albeit without a direct reference to the committee's Settlers Landing decision. See 760 Code Mass. Regs. § 56.06(5)(b)(5) (2008) (allowing preliminary "motions to clarify whether the Board's decision is a denial or a grant with conditions").

department regulations, are entitled to deferential review. " 'It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through rulemaking,' . . . and 'the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.' " *Hastings* v. *Commissioner of Correction*, 424 Mass. 46, 49 (1997), quoting *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 312-313 (1981). However, the committee's assertions are otherwise unavailing.

When determining the validity of an agency's decision, we first determine "whether the Legislature has spoken with certainty on the topic in question, and if we conclude that the statute is unambiguous, we give effect to the Legislature's intent." *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 632-633 (2005), citing *Smith* v. *Commissioner of Transitional Assistance*, 431 Mass. 638, 646 (2000). "Second, if the Legislature has not addressed directly the pertinent issue, we determine whether the agency's resolution of that issue may 'be reconciled with the governing legislation.' " *Goldberg* v. *Board of Health of Granby*, *supra* at 633, quoting *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.*, 421 Mass. 196, 211 (1995). The second part of our analysis requires "substantial deference" to the expertise and statutory " 'interpretation of [the] agency charged with primary responsibility' for administering a statute." *Goldberg* v. *Board of Health of Granby supra*, citing *Briggs* v. *Commonwealth*, 429 Mass. 241, 253 (1999).

Although we have noted that the act's text "is not without its ambiguities," *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354 (1973), the standards to be applied by the committee in reviewing board decisions are clear from the express language of the act. The committee is empowered to "order [the] board to modify or remove . . . [a] condition or requirement" *only* when the board's decision "makes the building or operation of such housing uneconomic *and* is not consistent with local needs" (emphasis added). G. L. c. 40B, § 23. The committee's authority to alter or set aside conditions imposed by a local board is, therefore, expressly delineated by the act, and it may not be expanded by recasting an approval with condi-

tions as a denial. The Settlers Landing decision affords the committee almost unbridled discretion to consider any condition limiting the size of a proposal as the functional equivalent of a denial and, accordingly, to subject the board's decision to a more exacting review. See Settlers Landing, *supra* at 3 ("an arbitrary reduction in the number of units may constitute the denial of a permit"). Such exceptionally broad discretion is inconsistent with both the language of the act and the "Legislature's careful balance between leaving to local authorities their well-recognized autonomy generally to establish local zoning requirements . . . while foreclosing municipalities from obstructing the building of a minimum level of housing affordable to persons of low income." *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 822 (2002).

Additionally, the express language of the act already contemplates a "functional" or "de facto" denial, that is, an approval with conditions that make the project uneconomic.[23] If a developer can demonstrate that a comprehensive permit was "granted with such conditions and requirements as to make the building or operation of such housing uneconomic," G. L. c. 40B, § 22, the conditions are then reviewed to determine if they are "consistent with local needs," G. L. c. 40B, § 23, that is, conditions that render a development uneconomic are reviewed by the committee under the *same* exacting standard as a denial: the board bears the burden of demonstrating that the conditions it imposed "are consistent with local needs." *Id.* Absent a showing that conditions placed on an approval render the project uneconomic, the committee is not empowered to review them under the denial standard.[24]

---

[23]As we held in *Jepson* v. *Zoning Bd. of Appeals of Ipswich*, 450 Mass. 81, 95 (2007), "the Legislature took into account that developers of affordable housing need to generate a reasonable economic return on their investment" by protecting developers against conditions that render "the building or operation of such housing uneconomic." *Id.*, quoting G. L. c. 40B, § 22.

As stated in note 5, *supra*, the term "uneconomic" is defined in G. L. c. 40B, § 20. Neither the regulations in effect at the time of the committee's decision in this case, nor those recently enacted, elaborate on the statutory definition. See 760 Code Mass. Regs. § 56.02 (2008); 760 Code Mass. Regs. § 31.06(3) (2001).

[24]We acknowledge the committee's argument that a number of communities

The committee maintains that the goal of the act "is to increase the supply of affordable housing and to locate that housing in communities where there is a particular shortage of housing for persons of low income," *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, *supra* at 827, and that its interpretation of the act is in furtherance of that purpose. This position "seems, at most, to be that such a power would be helpful in effectuating the legislative purpose underlying [the act]. That is quite possibly true, but it is not a basis for this court to invest the [committee] with powers beyond those given it by the Legislature." *Board of Appeals of N. Andover* v. *Housing Appeals Comm.*, 4 Mass. App. Ct. 676, 680 (1976).[25]

3. *Conclusion.* By written decision on September 10, 2001,

---

are imposing, as conditions of approval, size limitations that are discouraging the development of needed affordable housing and thereby undermining the purpose of the act. See *Taylor* v. *Housing Appeals Comm.*, *ante* at 149, 151 (2008), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354 (1973) ("The primary purpose of the act is 'to provide relief from exclusionary zoning practices which prevent[] the construction of badly needed low and moderate income housing' "). We also acknowledge that the reality of the development of affordable housing projects has changed significantly in the nearly forty years since the enactment of G. L. c. 40B, §§ 20-23. That municipalities, through their local zoning boards, might effectively prevent the construction of needed affordable housing through the use of conditions drastically reducing the size of such projects (making them "barely" economic), likely did not occur to the Legislature in 1969.

Yet, consistent with G. L. c. 40B, §§ 20-23, the remedy to the practice highlighted by the committee cannot be to treat a reduction in unit numbers as a "de facto" denial, thereby eliminating the uneconomic element of the prima facie case for relief. The department is, of course, not precluded from promulgating regulations that would more fully address the meaning of the term "uneconomic" in the context of the construction of affordable housing. For example, the committee itself has recently suggested the usefulness of more guidance on what standards to use in assessing whether conditions permit a "reasonable return" to the developer. See Farmview Affordable Homes, LLC v. Sandwich Board of Appeals, Housing Appeals Committee, No. 02-32, at 3 n.5 (May 21, 2004) ("[I]t might be useful to us in making our assessment of reasonable return to have an understanding of the standards used by MassHousing, the Department of Housing and Community Development, or other subsidizing agencies in making [their] financial feasibility findings. Where guidance on issues relating to reasonable return is offered to us by such agencies, we will avail ourselves of it, but we will rely on industry standards where it is not").

[25]In a footnote in its brief, the committee asserts that § 21 of the act precludes a local board from limiting the number of units in a proposed development as a condition of approval. That assertion is an insufficient appellate

the board approved the developer's application for a comprehensive permit under the act, attaching fifty conditions to its approval. On appeal, the committee determined that the developer failed to demonstrate that the conditions set by the board rendered the "building or operation of such housing uneconomic," G. L. c. 40, § 22, and the Superior Court judge concluded that this determination was supported by substantial evidence. The board, therefore, complied with the act in granting a comprehensive permit with conditions that were determined not to be uneconomic, and the committee lacked the power to revise or revoke those conditions.

To the extent the judgments below affirmed the committee's alteration of the board's conditions, those judgments are reversed. Judgments shall enter in favor of the board, and the comprehensive permit shall remain as originally granted, with all conditions intact except for condition number twenty imposing a 300-foot no-build buffer zone, which the board withdrew before the committee issued its first decision.

*So ordered.*

MARSHALL, C.J. (concurring). The decision of the Housing Appeals Committee (HAC) and the affirming decision of the judge in the Superior Court are entirely consistent with the legislative goal of promoting the construction of badly needed affordable housing in this Commonwealth. I concur in the result that the court reaches today reversing those decisions only because the Department of Housing and Community Development (department), of which the HAC is a part, G. L. c. 23B, § 5A, has not promulgated regulations to address the issue presented in this

argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975); Mass. R. A. P. 16 (b), as appearing in 411 Mass. 1602 (1992). See also *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958) ("the right of a party to have this court consider a point entails a duty; that duty is to assist the court with argument and appropriate citation of authority"). It also appears to be plainly incorrect. General Laws c. 40B, § 21, states, in relevant part, that "[t]he board . . . shall have the same power to issue permits or approvals as any local board or official who would otherwise act with respect to such application, *including but not limited to* the power to attach to said permit or approval conditions and requirements with respect to height, site plan, *size* or shape, or building materials as are consistent with the terms of this section" (emphasis added).

case. See G. L. c. 23B, § 6 ("The director shall make, and from time to time revise, regulations for the conduct of the business of the department, and such other regulations as may be required by law"). While the issue is not before us, I conclude that regulations, promulgated after notice and comment, further defining "uneconomic," as that term is used in G. L. c. 40B, would fall within the department's broad authority and would provide clear standards to enable consistent decision-making by the HAC. In the absence of any such governing regulations, the language of G. L. c. 40B, compels the result reached here.

It is clear that the reality of the development of affordable housing projects has changed significantly in the nearly forty years since the enactment of G. L. c. 40B, §§ 20-23, inserted by St. 1969, c. 774. Exclusionary zoning practices, which the statute is intended to overcome, *ante* at 582-583, have taken a new and apparently unforeseen form. That a local zoning board would, as the Woburn board is charged with doing here, drastically cut the size of a proposed project or would impose other onerous conditions that fall short of rendering the entire project "uneconomic," even where a far larger project is entirely consistent with local needs, likely did not occur to the Legislature in 1969. Our decision thus allows a local board unfettered discretion to stymie the construction of an affordable housing project without actually denying it or rendering it uneconomic, and insulates such a board's decision from review by the HAC. The Legislature's goal of overcoming exclusionary local practices is thus thwarted. See *Taylor* v. *Housing Appeals Comm.*, *ante* 149, 151 (2008), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354 (1973) ("The primary purpose of the act is 'to provide relief from exclusionary zoning practices which prevent[] the construction of badly needed low and moderate income housing' ").

The HAC and the Superior Court judge, relying on HAC decisions, attempted to solve this problem by treating the board's action as a "de facto," or constructive, denial. The principle that a party might be found to have constructively taken some action — particularly by imposing intolerable conditions that force another party's hand — is well established in our law. See, e.g., *GTE Prods. Corp.* v. *Stewart*, 421 Mass. 22, 33-35 (1995) (discussing constructive discharge, in which employee's resignation

due to employer's conduct is regarded as termination by employer). The difficulty is that at present, the only form of constructive denial provided by G. L. c. 40B and its implementing regulations is an approval that renders an entire project uneconomic. *Ante* at 594. Nothing in G. L. c. 40B or in any of the implementing regulations promulgated by the department provides any guidance as to when a dramatic reduction in the size of a project might be deemed uneconomic.

If a local board conditions the issuance of a comprehensive permit on drastically reducing the size of a project, and the HAC concludes that the reduction is unjustified and that a project of a larger size than allowed by the board would be consistent with local needs, the HAC should have the authority to consider whether the project is effectively uneconomic under appropriately promulgated regulations. The department possesses extensive authority to promulgate appropriate regulations, G. L. c. 23B, § 6, and to do so would provide much-needed guidance for the HAC, as well as for developers and municipalities. See, e.g., *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 524-525 (2007) (department did not exceed authority by promulgating regulation with expansive definition of "subsidy"); *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 654-656 (1982) (upholding regulation providing that projects financed by Massachusetts Housing Finance Agency were within definition of "low or moderate income housing"). Regulations defining "uneconomic" might, for example, assist the HAC in determining when a reduction in the number of units renders a project uneconomic, defining "reasonable return," or perhaps providing that a reduction over a certain percentage should be presumed uneconomic. In the absence of appropriate regulations, a local board remains free to impede the pace at which affordable housing units — so urgently needed — are constructed in the Commonwealth, even if a larger project would be entirely consistent with local needs.